IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RICHARD GORDON<br>831 Maple Court #208<br>Dunedin, Florida 34698<br><br>Plaintiff,<br><br>-vs-<br><br>CARLETON McKENNA & CO, LLC<br>600 Superior Avenue East, Ste. 1425<br>Cleveland, Ohio 44114<br><br>-and-<br><br>CARLETON McKENNA ADVISORS, LLC d/b/a CARLETON McKENNA & CO, LLC,<br>600 Superior Avenue East, Ste. 1425<br>Cleveland, Ohio 44114<br><br>-and-<br><br>PAUL H. CARLETON<br>21306 Brantley Rd.<br>Shaker Heights, Ohio 44122<br><br>-and-<br><br>GARETT FORTUNE<br>102 North Water Street #308<br>Milwaukee, Wisconsin 53202<br><br>Defendants. | CASE No.:<br><br>JUDGE:<br><br>COMPLAINT FOR MONEY DAMAGES AND TO VOID CONTRACT FOR SALE OF SECURITIES<br><br>(Jury Demand Endorsement) |

For his Complaint against Defendants, Carleton McKenna & Co., LLC (CM&Co), Carleton McKenna Advisors, LLC (Advisors), Paul Carleton (Carleton), and Garett Fortune (Fortune), Plaintiff, Richard Gordon, alleges that:

## JURISDICTION

1. This is an action for rescission of securities under § 1707.43 and money damages under that statute and Ohio common law fraud, negligent misrepresentation, and civil conspiracy.

2. This Court has jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship).

## VENUE

3. Venue is proper in this District because (a) a substantial part of the events and/or omissions giving rise to Plaintiff's claim occurred in this District and/or (b) a substantial part of the investment involved in this action is located in this District.

## FACTS

4. Plaintiff is a citizen of the state of Florida.

5. Plaintiff retired from the insurance industry in February 2024, but continues his entrepreneurial efforts, including those as the owner of UNITS Portable Moving and Storage of Milwaukee (UNITS Milwaukee), a franchise of UNITS Portable Moving and Storage, Inc.

6. CM&Co is an Ohio limited liability company founded in 2010.

7. CM&Co is an independent mid-market investment bank retained exclusively by founders, owners, and operators who have built something worth selling.

8. Carleton McKenna Advisors, LLC (Advisors) is an Ohio limited liability company founded in 2011.

9. Advisors does business as CM&Co.

10. Advisors is a limited product broker dealer registered with the Financial Industry Regulatory Authority (FINRA), Securities and Exchange Commission (SEC) and Securities Investor Protection Corporation (SIPC).

11. Paul Carleton (Carleton) is a citizen of the state of Ohio, and the managing partner and statutory agent of CM&Co and Advisors.

12. Garett Fortune (Fortune) is a citizen of Wisconsin who, at all times material, was a citizen of Ohio, a friend of Plaintiff, and a self-described entrepreneur, operator, and business development executive with more than 25 years of experience building companies, developing strategic partnerships, and creating growth opportunities in highly-regulated industries.

13. In September 2024, Fortune told Plaintiff and others that he, Fortune, had just made $1 million by raising $20 million for an investment in Aspiration Partners, Inc. (Aspiration).

14. Aspiration was a California-based, Delaware company which at all times material did business as Catona Climate (Catona).

15. Fortune then introduced Plaintiff to Carleton via a late-night September 4, 2024 email.

16. Fortune informed Carleton that Plaintiff was interested in considering an opportunity with Joseph Sanberg (Sanberg) and added that it would be beneficial for Fortune and Carleton to set up a group call with Sanberg to discuss the details and ensure that the investment worked for everyone.

17. A California citizen and political activist, Sanberg co-founded Aspiration and was its Chairman of the Board of Directors.

18. On September 5, 2024, Fortune texted Plaintiff about an accompanying link to a July 6, 2016 article captioned "Fireside Chat with Aspiration Co-Founder and Chairman of the Board of Aspiration."

19. In a later September 5, 2024 text, Fortune told Plaintiff that "Paul will be sending the deck and offering today for review."

20. When he learned that Carleton was occupied with moving into a new house, Fortune then forwarded a July 24, 2024 email that Carleton had sent to Fortune.

21. In that July 24, 2024 email, Carleton informed Fortune that "Carleton McKenna & Co., is assisting the founder of Catona Climate (previously Aspiration), Inc., www.catona.com, Joe Sanberg in selling a portion of his 40% ownership stake to retire $200 million of personal debt he incurred to avoid dilution in financing the company's growth. There is $30 million of remaining capacity in this opportunity."

22. Carleton added:

> Catona originates and finances carbon removal projects that produce carbon credits that it sells to investment grade enterprise clients under long-term contracts. This sustainability as a service company's clientele includes Facebook, Deloitte, Societe Generale, Etsy, Bank of America, NEC Global, Etsy, among many others. Significantly, Deloitte has just named Catona as their exclusive source of carbon for their international clientele (see attachment).
>
> Fortune 500 companies turn to Catona for high quality carbon credits because of the mounting pressures they face from their shareholders, employees, customers, and regulators to neutralize their carbon emissions. What makes Catona's market position unique is it combination of a substantial inventory of 400 metric tons of carbon removal capacity (which is 10x its competitors) and the credibility of the investment grade clients who have associated themselves with Catona.
>
> We have an independent valuation from a nationally recognized appraisal firm that values the company at about $9 billion. That's against $700 million plus of revenue and $220 million in EBITDA in 2023 and the 2024 revenue forecast is expected to exceed $1 billion with EBITDA in excess of $400 million. Joe selling shares at a compelling valuation in order to facilitate a speedy close
>
> Post NDA, Joe will share full corporate, subscription, financial docs, and more information on the market, etc.

23. Carleton then provided "recent market and company-specific supplementary information," including links to (a) a Yahoo Finance Article entitled "Catona Climate to Deliver Microsoft 350,000 Tons of Carbon Removal through Agroforestry Project," (b) recent media and videos of Aspiration and its client, Sonos, and (c) "a Deloitte Partner discussing why they chose Catona as their go to player in the carbon credit space."

24. Carleton concluded the email by thanking Fortune "for taking a look at the material," and offering "to arrange a virtual call with Joe Sanberg."

25. Fortune attached the Aspiration Investor Deck to his September 5, 2024 email to Plaintiff.

26. An investor deck typically is a presentation that startups use to communicate business plans, visions, and potentials to investors. It also is called a "pitch deck" or "investment deck."

27. The December 2022 confidential and proprietary Aspiration Investor Deck that Fortune forwarded to Plaintiff consisted of 15 slides.

28. In its "Executive Summary" slide, the Aspiration Investor Deck described (a) the company as "a high-impact CLIMATE FINANCE company" that, *inter alia,* "originate[d], diligence[d], invest[ed] in and monitor[ed] carbon removal projects on a global scale to generate carbon credits," and (b) the market for carbon removal as "large and growing rapidly."

29. In the last of its Deck slides, Aspiration proclaimed that it possessed "Unique Capabilities Summary," including (a) "Innovative Financing" that "[a]ttracted Best in Class Developers *** via [a] Unique Project Finance Approach; (b) Uncompromising Assets" such as "Historical Growth Benchmarking & Visualization"; (c)

"Bleeding Edge Technology" with a "Demonstrated Track Record Building Financial Platforms and Deploying Climate Actions Products at Scale"; and (d) "Unmatched Distribution" that was "Uniquely Posed to Capture Entire Market" with a "Proven Track Record Successfully Servicing Climate Solutions to Large Governments, Large & Small Enterprises, and Individual Consumers."

30. When he responded to Fortune's September 5, 2024 email, Plaintiff wrote, "I read the fireside chat on linked in [sic]. Also saw a video of Joe with Paul at a Clippers press conference talking about climate impact and one of his companies, Aspiration. He sounds like a very interesting guy looking to solve a number of social issues."

31. Carleton and Fortune's emails were devoid of any reference or discussion of a July 10, 2024 *Bloomberg N*ews article, captioned "*DiCaprio-Backed Green Finance Startup Unraveled on Dubious Deals,*" in which the authors reported that:

> *** [T]oday Aspiration is struggling to stay afloat and faces an investigation by US authorities, including the Department of Justice and the Securities and Exchange Commission. The inside story of the unraveling of this once-promising climate company comes down to its hurried effort to start a new business line—and boost its revenues—by selling sustainability services, such as tree planting, to other companies.

32. Sanberg, Carleton and Fortune did not discuss or address the *Bloomberg* article until Plaintiff raised it on September 9, 2024, despite the fact that three days earlier, on September 6, 2024, all four men had participated in a videoconference.

33. During that September 6, 2024 videoconference, Sanberg talked about his past career as the founder of Blue Apron, an ingredient-and-recipe meal kit company, his passion for having a positive impact on the climate and world, how Catona was going to be a leader in doing so, and several significant clients with Catona.

34. Within hours after the videoconference, Sanberg emailed Plaintiff, Fortune and Carleton, attaching (a) a Stock Purchase Agreement reflecting Plaintiff's $550,000 investment and (b) a Stock Transfer Agreement to register shares in Plaintiff's name.

35. Plaintiff promptly signed the Stock Purchase and Stock Transfer Agreements, and sent the executed documents to Sanberg via an email that he copied to Carleton and Fortune.

36. In a reply email that he copied to Carleton and Fortune, Sanberg thanked Plaintiff for "becoming our partner."

37. Sanberg reiterated his thanks three days later in a September 9, 2024 email to Plaintiff regarding "Catona response to media."

38. Copied to Carleton and Fortune, that September 9, 2024 email contained Sanberg's response to the fact that, after executing and returning the Stock Purchase and Transfer Agreements, Plaintiff had discovered the July 10, 2024 *Bloomberg* article and expressed his uneasiness to Fortune in a text and then in an email to Sanberg, Carleton and Fortune.

39. Sanberg's response was a short message coupled with the forwarding of a July 17, 2024 email from Ibrahim AlHusseini to Sanberg and Carleton regarding "Re: Cantona Intro."

40. Sanberg's short message was:

> First, I hope to heaven my Packers enthusiasm wasn't any form of bad luck! Second, Garett shared that you came across a Bloomberg article. Below is a note from mid-July from one of Catona's board members, Ibrahim AlHusseini, to Paul Carleton with Catona's response to that article.
>
> I'm happy to chat by phone or video as well.
>
> Thank you for your partnership.

41. In his July 17, 2024 email, AlHusseini had written:

Below are the talking points that the company issued, but I am happy to expand further.

In general, the primary motivation for authoring this article was to get the writer's name next to the celebrity investors we have. That is why he used all their names in the title. This was a way for him to bait clicks and give his work some attention. It didn't work. This article has garnered close to zero traction. Additionally, this journalist never misses an opportunity to try and dent the carbon markets. He is an eco-purist who wants the world to decarbonize immediately and does not support systems to offset emissions while the transition to 100% renewable energy is completed (we are now at less than 1% globally). That is why Carbon Credits are predicted to be a $27 trillion market in the next 30 years. Additionally, the article is primarily about the legacy fintech business that was sold off and not Catona.

The most surprising thing about the article is the claim that our auditors resigned. That is completely false, and we have been in touch with Bloomberg's legal department to demand a retraction. We have spoken to KPMG, and they are shocked by this claim. It is true that we transitioned from KPMG to BDO, but that was with KPMG's full endorsement, as BDO has better carbon expertise. Also worth noting, the lawsuit mentioned in the article is against a different entity than the one you are invested in and is being withdrawn. Lastly, Eden, who is suing us for "millions," is actually suing for $2.6M, and we are suing them for $6M for not delivering on their contract, which we already paid for.

Regarding the core allegations of the article, these were investigated and dismissed. I was on the special board committee that hired Baker Hostetler, so I would be happy to opine further on the matter when we speak next week. We gave them complete access, they took 4.5 months to investigate, cost us over $4M+ dollars, found no wrong doing and completely vindicated Joe. Also, once you find out what percentage of 2021 revenue these so-called "suspect" transactions represented, you are going to roll your eyes and chuckle.

The bottom line is we have a journalist who was fed a narrative that presented him with an opportunity to associate his name with many high-profile celebrities and investors. He also relished the chance to take a swipe at a business line he has been crusading against since well before Catona ever existed, and he stubbornly clings to it despite evidence to the contrary.

As far as I am concerned, this article says more about the state of journalism in a shifting media landscape than it does about Catona. Rest assured, Catona is and will continue to be the leader in this massive and growing market and will likely be the biggest win in our investment careers.

42. Then, in a statement that Fortune described as a "very formal response," AlHusseini added what he termed the "**External Stakeholder narrative**." (Emphasis in original). It read:

> A reporter from Bloomberg, Ben Elgin, is to publish later this week.
>
> The article tries to make sensational and misleading claims about so-called historic "circular deals," which are untrue.
>
> The journalist has been fed an entirely biased and false narrative. Although Bloomberg has refused to disclose their source, we have strong reason to believe it is an individual working for a direct competitor, deliberately attempting to tarnish the company's reputation. We believe this individual was commercially motivated, and willfully offered a distorted narrative of events that allegedly occurred while they were not even part of the company.
>
> Despite awareness of this, the reporter chose to knowingly accept third hand accounts as accurate.
>
> We are extremely disappointed in Bloomberg's approach to this misleading story.
>
> Bloomberg has been working on this piece for over five months, indicating their difficulty in corroborating these misleading claims. The reporter often went to extreme measures to extract quotes on these allegations – even going so far as acknowledging in outreach he understood a potential source was not part of the company during that time – yet continued to ask for a response to the allegations anyway. This was always accompanied by an immediate promise of anonymity. We know this because multiple partners, colleagues, and former employees reached out to us regarding this reporter's underhanded behavior.
>
> Further, the reporter has a very well known bias against corporate climate action and particularly the Voluntary Carbon Market, solely writing negative articles to support his views (often repeating the same article with recycled talking points, over and over again).
>
> The reporter tasked us with refuting allegations from over three and a half years ago, regarding individuals who no longer hold their roles with the company – specifically, Andrei Cherny, then then turned around and never used our responses, since they didn't fit his narrative and would have likely killed his story.

> Regardless, we have provided a comprehensive rebuttal to Bloomberg, including this formal statement: “We categorically reject these speculative and inaccurate claims. Historic concerns from 2021 were thoroughly investigated by an independent review conducted by BakerHostetler, which found no evidence of wrongdoing. Our financial statements accurately reflect revenue from services delivered, in accordance with proper accounting methodologies."
>
> We have every reason to be proud of our business as it is today and the incredible work we’re doing for the climate. Our efforts are making a tangible impact, driving meaningful change, and setting new standards in the industry. The dedication and passion of our team is reflected in each and every one of our achievements, and nothing will stop us continuing in our mission to protect our planet for future generations.

43. That “very formal response” sufficiently quieted Plaintiff’s concerns to persuade him to carry through with his investment, as he advised Sanberg in another September 9, 2024 email that Plaintiff copied to Fortune and Carleton.

44. In that email, Plaintiff wrote:

> Thanks for the quick response - I just read the article an hour ago. Obviously there is risk with any investment, but I think anyone would experience the uneasiness I felt while reading that article. I limit my investments into what I consider “alternative investments” to no more than 25% of my net worth, so I do have comfort in taking on such investments.
>
> And I'm comfortable sharing that $550k is nearly 10% of my net worth (I'm working to grow my $6 million net worth to $10 million by 2030 when I turn 60). I'm going to continue with my partnership and place trust in you all. Garett is my neighbor and I respect his entrepreneurship, and I see a budding friendship developing - so I can't imagine that coming back to bite me.
>
> I did outline to Garett that I need my invested principal back within a couple years - I'm paying off what will be a $600k balance on an SBA loan I used to buy a side business (UNITS Milwaukee - a competitor to PODS portable moving and storage). So that's what I found attractive with this investment - the plan to get a return next year. I told you on the call last week that I would look to get my invested principal back at that time and let the rest of the equity ride over the long term. I hope that plan comes to fruition.
>
> I appreciate you sending me this internal information - it gives me some comfort after reading that article.

I would enjoy the opportunity to connect again on a call this week.

45. Sanberg then thanked Plaintiff for "communicating candidly with us," and declared, "I take seriously what this investment means to you and the trust you are placing in us," before adding, "I'm glad you're proceeding and that we will be partners in Catona."

46. Sanberg texted Plaintiff the next day, September 10, 2024. Despite the "very formal" response from AlHusseini, Plaintiff informed Sanberg that he still had "some difficulty sleeping last night given that Bloomberg article," and that his "biggest concern is having the return of my $550k investment by 6/30/26, which is when my current 4.75% SBA loan interest rate resets (which would be 10% today based on current prime rate)," Sanberg thanked Plaintiff for expressing his concerns.

47. Then Sanberg offered to sign a side agreement giving Plaintiff the right to sell his shares back to Sanberg within a year, before adding:

> Second, would you like to talk by phone further about the Bloomberg article? Beyond what you read in the email from the company, I believe I can further put your mind at ease. For example, both Netflix and Apple have committed to 9 figure purchase from Catona in the time since that article came out. Companies like those do extensive 9-12 month diligence processes on Catona.

48. When Plaintiff replied that "Wow, I do like that side agreement offer – that would put me at ease. And we co[u]ld have that date to be in early 2026 since I don't need the fund[s] [un]til 6/30/26. And I will see how things are progressing at that time (hopefully very well!!)," Sanberg declared that he was "glad to do that," and pledged to "write up a side deal with the date of 3/31/26 and email to you," before asserting that "I know these articles can be jarring but the media has deteriorated from the days you and I were young. It's so much become about attracting clicks through sensational gossip rather than reporting truth and information."

49. After that text exchange, Sanberg promptly emailed a put agreement to Plaintiff and, again, thanked Plaintiff for his "partnership."

50. Plaintiff then texted Fortune to update him about Plaintiff's email and text exchange with Sanberg. In turn, Fortune texted Plaintiff that (a) Fortune was lining up a call with Carleton; (b) Carleton was Fortune's broker dealer and managed all other investors; (c) Fortune and Plaintiff could talk with Sanberg the next day; and (d) Sanberg and the other investors thought that "this is the best outcome and they're happy to talk with you about it."

51. Plaintiff then informed Fortune that Plaintiff had emailed Fortune and Carleton.

52. Before the end of September 10, 2024, Sanberg emailed a letter to Plaintiff, in which Sanberg wrote:

> This letter serves to affirm that I am providing you a put right to compel me to repurchase at the same price ($34.04 per share) you paid ("Put") any and up to all of the 16,157 shares you purchased in CTN Holdings, Inc as detailed below.
>
> Starting on March 31, 2026 and for a period of 30 days, you have the right to exercise the Put via email notice to me. Upon notice, I will have 3 business days to wire you an amount that equals the number of shares you wish to compel me to repurchase multiplied by your original purchase price of $34.04 per share.
>
> For avoidance of doubt, you can exercise the Put against all or a portion of your 16,157 shares.

53. Plaintiff responded almost immediately, emailing Sanberg and Fortune thanking them for "the email with the testimonials," and confirming that the put agreement "makes me feel much more secure about my financial in 2026."

54. Three days later, on September 13, 2024, Plaintiff had his bank wire $549,984.28, the amount specified in Ex. B to Stock Purchase Agreement, in payment for his 16,157 shares.

55. Then, on September 15, 2024, Sanberg again texted his thanks to Plaintiff for Plaintiff's "confidence and trust."

56. Five days later, Sanberg emailed Plaintiff, Fortune and Carleton regarding "Catona's Sustainable Agroforestry Training Program," and pledging to share monthly updates of newsworthy notes.

57. Neither Sanberg nor anyone else provided an update in October 2024, despite the fact that AlHusseini had been (a) arrested on October 7, 2024 and, in an October 8, 2024 criminal complaint, (b) accused of securities fraud in connection with Catona f/k/a Aspiration.

58. The November 2024 election results prompted Plaintiff to email a November 6, 2024 request that Sanberg effectuate the put option then rather than waiting until March 2026. Plaintiff wrote that "I'm just very nervous about the state of all climate-related businesses given this election cycle (and frankly, I've been anxious since wiring these funds - which are significant to my net worth given my retirement this year.)"

59. In response, Sanberg, Fortune and Carleton conducted another videoconference with Plaintiff on November 8, 2024. Approximately 15-20 minutes in length, the videoconference confirmed that which Fortune previously had told Plaintiff, namely that an investor had increased his investment from $5 million to $10 million because of the election of Donald Trump. Plaintiff renewed his request to have Sanberg execute the put agreement early, but it remained unchanged.

60. While AlHusseini remained in custody until a group of political activists posted his $3 million bond in mid-November 2024, neither Sanberg, Fortune nor Carleton informed Plaintiff of AlHusseini's arrest or the suspicion that AlHusseini had committed securities fraud.

61. Sanberg provided a noteworthy update on December 6, 2024, in an email entitled "Major expansion of Catona inventory." In that email, which was copied to Fortune and Carleton, Sanberg wrote, "I'd like to share this announcement of an additional up to 50 million tonnes [sic] of carbon credits that Catona has secured through this joint venture: https://www.prnewswire.com/news-releases/compassionate-carbon-and-catona-climate-join-forces-to-scale-nature-based-projects-302324451.html?=prn." He then added, "This is an important move to support the significant growth in demand from Catona's clients. Thank you for your partnership!" But, once again, Sanberg failed to disclose Husseini's arrest or the fact that AlHusseini had been released from custody in November 2024, after posting a $3 million bond.

62. Plaintiff responded to Sanberg's December 6, 2024, with one of his own, in which he wrote, "Great to see! Thanks for sharing, Joe. I look forward to the coming year!"

63. Six weeks later, Sanberg provided his next update in a January 17, 2025 email to Plaintiff, which was copied to Fortune and Carleton. Styled "significant Catona announcement," the email read:

> I'm thankful to share the following news this morning of Tencent entering into a large purchase of carbon credits from Catona.
>
> It's significant both for the dollars and to validate that China is part of Catona's total addressable market.
>
> https://www.prnewswire.com/news-releases/catona-climate-partners-with-tencent-to-deliver-high-quality-nature-based-carbon-removal-solutions-302354097.html?tc=eml_cleartime

64. While he touted the news of the Tencent purchase, Sanberg did not share the news of AlHusseini's criminal case, even though it was reported in an January 7, 2025 online article in the Dailywire entitled "EXCLUSIVE: Green Energy Investor Arrested In Securities Fraud Probe."

65. No one provided an update to Plaintiff in February 2025.

66. Then, on March 3, 2025, (a) federal authorities arrested Sanberg and charged him with defrauding investors out of at least $145 million, and (b) AlHusseini pleaded guilty to an information charging him with wire fraud for falsifying documents and information to assist Sanberg.

67. Neither Fortune nor Carleton informed Plaintiff of Sanberg's arrest or AlHusseini's guilty plea.

68. Nor did Sanberg, Fortune or Carleton inform Plaintiff of Catona's March 30, 2025 Chapter 11 bankruptcy filing.

69. Plaintiff first learned of Sanberg's arrest in May 2025, when he searched online for news of Catona's progress and found a March 6, 2025 article entitled "Aspiration Co-Founder Joseph Sanberg Arrested for Alleged $145 Million Investment Fraud," at Aspiration Co-Founder Joseph Sanberg Arrested for Alleged $145 Million Investor Fraud - FinTech Weekly.

70. Similarly, Plaintiff first learned of the Catona bankruptcy during that same online search. He found the article "Case Summary: Catona Climate Chapter 11," at https://bondoro.com/catona-climate/.

71. After discovering Sanberg's arrest and Catona's bankruptcy, Plaintiff emailed Fortune and Carleton seeking their input regarding an email that Plaintiff intended to send to Sanberg.

72. When neither Fortune nor Carleton responded, Plaintiff emailed them and Sanberg, writing:

> I just did a quick Google search of Catona Climate to see if there was any news regarding the company's progress and this was the second link that came up https://bondoro.com/catona-climate/
>
> Joe, can you explain what this action is all about? It references a 363 sale within 55 days of the petition's filing.
>
> I know we have a side agreement to reimburse my $550,000 investment at end of March next year, but wanted to get a sense of the current situation. Would you be open to reimbursing me now instead? I just want to make sure I have that $550k when I pay off a $600k SBA loan that needs to be paid by 6/30/26.

73. When no one responded to that email from Plaintiff, he texted Fortune on May 14, 2025, who informed Plaintiff that Fortune was "meeting with Paul this afternoon as well as the lawyers to find out what is happening."

74. The next day, Fortune texted Plaintiff that Carleton "push[ed] off" the discussion until that day, i.e., May 15, 2025.

75. On May 16, 2025, Fortune texted Plaintiff that Carleton has said that, if Plaintiff had not talked with Sanberg, he should do so.

76. Thereafter, Carleton never communicated directly with Plaintiff.

77. In September 2025, the federal government filed a superseding information, charging Sanberg with two counts of wire fraud in violation of Title 18, United States Code, Section 1343, in connection with the operation of and his conduct with Catona.

78. The government and Sanberg simultaneously filed a plea agreement, which the District Court approved, in which Sanberg agreed to plead guilty to orchestrating a five-year scheme to defraud investors and financial institutions of at least $248 million.

79. On June 2, 2026, a federal court sentenced Sanberg to 14 years in federal prison. AlHusseini is scheduled to be sentenced on October 19, 2026.

80. Having not received the return of his investment, Plaintiff was forced to renew his SBA loan, but at increased interest rate of 8.25%, which necessitated liquidating assets and restructuring other debt.

81. A Cuyahoga County, Ohio, grand jury indicted Fortune on June 22, 2026, charging him with 20 counts of securities' offenses in *State of Ohio v. Garett Fortune,* Cuyahoga County CP No. CR-26-713209, including (a) false representation in the sale of securities, (b) securities fraud, (c) theft of a person in a protected class, (d) grand theft and (e) money laundering regarding multiple investors during the years of 2021 and 2022.

**COUNT ONE: VIOLATION OF OHIO SECURITIES LAW**

82. Incorporating the allegations in the foregoing paragraphs, Plaintiff further alleges Defendants violated Ohio Revised Code § 1707.43 by (a) materially misrepresenting the value of the Aspiration f/k/a Catona securities, (b) failing to discover, through reasonable diligence that the securities which Plaintiff purchased were worthless and/or (c) failing to disclose that they were or would become worthless.

83. Plaintiff relied upon the representations that Sanberg made to Plaintiff during the September 6, 2024 videoconference and after Plaintiff learned of the reports that Aspiration (a) was struggling to stay afloat and (b) faced investigations by such

governmental authorities as the United States Department of Justice and the Securities and Exchange Commission.

84. Plaintiff would not have purchased the securities without Sanberg's representations.

85. Defendants knew and/or failed to discover, through the exercise of reasonable diligence, that Sanberg's representations were false and/or misleading.

86. Defendants did not rebuff, qualify or in any other way challenge Sanberg's representation about the reports that Aspiration was struggling and/or that the United States Department of Justice and the Securities and Exchange Commission were investigated the company.

87. Carleton, CM&Co and/or Fortune failed to disclose any knowledge of the falsity of Sanberg's representation or to voice any reservations about its accuracy.

88. As a result, Plaintiff was misled into purchasing shares of stock in Aspiration, and has suffered monetary and emotional damages in an amount to be determined at trial, but in no event less than $550,000.

**COUNT TWO: FRAUD**

89. Incorporating the allegations in paragraphs 1-81, Plaintiff further alleges that Defendants knew or in the exercise of reasonable diligence failed to discover (a) that shares of stock in Aspiration were worthless when they were sold to Plaintiff; (b) that Sanberg never intended to abide by the put agreement that he entered with Plaintiff; and/or (c) the criminal conduct criminal conduct of Sanberg and/or AlHusseini.

90. Defendants concealed their knowledge of (a) the criminal conduct and/or (b) the allegations of criminal conduct of (i) Sanberg and/or (ii) AlHusseini from Plaintiff.

91. Defendants had a duty to disclose to Plaintiff information that (a) might dissuade Plaintiff from (i) purchasing shares of stock in Aspiration f/k/a Catona Climate and/or (ii) entering into a put agreement with Sanberg, and/or (b) could be potentially detrimental to his investment in that company.

92. Defendants breached their duties to disclose to Plaintiff information that (a) might dissuade Plaintiff from (i) purchasing shares of stock in Aspiration and/or (ii) entering into a put agreement with Sanberg, and/or (b) could be potentially detrimental to his investment in that company.

93. By concealing facts which (a) might dissuade Plaintiff from (i) purchasing shares of stock in Aspiration and/or (ii) entering into a put agreement with Sanberg, and/or (b) potentially could be detrimental to his investment in that company, Defendants deprived Plaintiff of information that was material to (a) his purchase of shares of stock in Aspiration and/or (b) his acceptance of the put offer by Sanberg.

94. Had Plaintiff known that (a) the shares of stock in Aspiration were worthless, (b) the reports of criminal conduct were (i) true or (ii) credible, and/or (c) that Sanberg would, was likely to, and/or had breached his put agreement with him, Plaintiff would not have entered into the put agreement, would not have purchased the shares of stock in Aspiration or, having purchases those shares, he would have sued Sanberg for anticipatory breach of the put agreement had Sanberg not agreed to advance the call date.

95. Plaintiff justifiably relied on the misrepresentations that the securities were valuable and that Sanberg would abide by the terms of the put agreement..

96. As a result, Plaintiff was misled into buying shares of stock in Aspiration and has suffered monetary damages and emotional distress in an amount to be determined at trial, but in no event less than $550,000.

## COUNT THREE: NEGLIGENT MISREPRESENTATION

97. Incorporating the allegations in paragraphs 1-81, Plaintiff further alleges that, in the course of their businesses and/or in a transaction in which they had pecuniary interests, Defendants falsely and misleadingly represented (i) the value of the shares of stock that Plaintiff bought from Aspiration, (ii) the truth of the reported allegations against Sanberg, Husseini and/or about Aspiration, and/or (iii) the fact that Sanberg either (a) never intended to abide by the terms of the put agreement or (b) determined after its execution that he would not do abide by its terms.

98. The financial health of Aspiration, the truth of the reported allegations against Sanberg, Husseini and/or Aspiration, and and/or Sanberg's intentions regarding the terms of the put agreement were material to Plaintiff's (i) acceptance of Sanberg's put agreement offer and (2) investment in Aspiration.

99. Plaintiff justifiably relied upon that false and misleading information to his detriment when he (a) entered into the Sanberg put agreement, (b) invested in Aspiration, and (c) did not exercise his rights under the Sanberg put agreement before (i) Aspiration filed from bankruptcy protection and/or (ii) AlHusseini and/or Sanberg became criminal defendants and/or convicted felons.

100. Had Defendants, separately and/or collectively, exercised reasonable care or competence in obtaining or communicating the false and misleading information, Plaintiff would not have entered into the Sanberg put agreement nor would Plaintiff have invested in Aspiration.

101. As a result, Plaintiff was misled into buying shares of stock in Aspiration and has suffered monetary damages and emotional distress in an amount to be determined at trial, but in no event less than $550,000.

**COUNT FOUR: CIVIL CONSPIRACY**

102. Incorporating the allegations in paragraphs 1-81, Plaintiff further alleges that Carleton and CM&Co conspired with Sanberg and/or Fortune to defraud Plaintiff by (a) misrepresenting or concealing (i) the value of the shares of stock that Plaintiff bought from Aspiration, (ii) the truth of the allegations against Sanberg and/or Husseini and/or about Aspiration, and/or (iii) the fact that Sanberg either (a) never intended to abide by the terms of the put agreement or (b) determined after its execution that he would not do abide by its terms.

103. As a result, Plaintiff was misled into buying shares of stock in Aspiration and suffered monetary damages and emotional distress in an amount to be determined at trial, but in no event less than $550,000.

**COUNT FIVE: BREACH OF FIDUCIARY DUTY**

104. Incorporating the allegations in paragraphs 1-81, Plaintiff further alleges that Carleton, Advisors and CM&Co owed fiduciary duties to Plaintiff.

105. Carleton, Advisors and CM&Co breached their fiduciary duties to Plaintiff by failing to (a) discover through the exercise of reasonable diligence Sanberg and/or AlHusseini's fraud, and/or (b) disclose information regarding that fraud to Plaintiff.

106. As a result, Carleton, Advisors and CM&Co deprived Plaintiff of material information that could have (a) dissuaded him from purchasing shares of stock in Aspiration, (b) voided and/or rescinded that purchase, (c) prompted him to not enter into the worthless put agreement, and/or (d) sued Sanberg at a meaningful time and in a meaningful manner to secure the relief provided by the put agreement.

107. As a result, Plaintiff was misled into entering into the put agreement and/or buying shares of stock in Aspiration and suffered monetary damages and emotional distress in an amount to be determined at trial.

108. Having purchased worthless shares of stock in Aspiration, Plaintiff has suffered monetary damages and emotional distress in an amount to be determined at trial, but in no event less than $550,000.

**COUNT SIX: AIDING AND ABETTING BREACH OF CONTRACT**

109. Incorporating the allegations in paragraphs 1-81, Plaintiff further alleges that Sanberg breached the terms of the put agreement between him and Plaintiff.

110. Carleton and CM&Co aided and abetted Sanberg's breach of that put agreement by failing to (a) discover through the exercise of reasonable diligence Sanberg and/or AlHusseini's fraud, and/or (b) disclose to Plaintiff information regarding that fraud..

111. As a result, Plaintiff was misled into buying shares of stock in Aspiration and has suffered monetary damages and emotional distress in an amount to be determined at trial, but in no event less than $550,000, exclusive of interest and costs.

Wherefore, Plaintiff prays that this Court enter judgment against Defendants, jointly and severally, for (1) rescission of the securities purchase agreement, (2) compensatory damages in an amount to be determined at trial, but in no event less than $550,000, exclusive of interest and costs, (3) punitive damages in an amount to be determined at trial; (4) reasonable attorney's fees; and (5) the costs of this action.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b)(1), Fed. R. Civ. P., Plaintiff demands a trial by jury.

Respectfully submitted,

/s/ David J. Kovach
DAVID J. KOVACH (002117)
DJKovach Law LLC
4015 W. 166th Street
Cleveland, OH 44135-1203
P: 216.787.7944
F: 971.367.5490
E: davidjkovach@outlook.com

Attorney for Plaintiff